## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>ex rel. SHARON ENGRAM | ) <br> ) <br> ) | |
| STATE OF GEORGIA<br>ex rel. SHARON ENGRAM | ) <br> ) <br> ) | |
| Plaintiff-Relator, | ) <br> ) | Civil Action No. 1:15-cv-3737<br>Jury Trial Demanded |
| v. | ) <br> ) | FILED UNDER SEAL |
| COMFORT COMMUNITY CENTER, LLC;<br>and EMMANUEL WOHIREN, | ) <br> ) <br> ) | |
| Defendants. | ) | |

### FIRST AMENDED COMPLAINT

Relator Sharon Engram, on behalf of herself, the United States of America,

and the State of Georgia, brings this action and shows the following:

### JURISDICTION AND VENUE

1.     This action arises under the Federal False Claims Act, as amended, 31

U.S.C. §§ 3729 *et seq.*, and the State False Medicaid Claims Act, Ga. Code Ann.

§§ 49-4-168.1 *et seq.*

2.     This court has subject matter jurisdiction over this action pursuant to 28

U.S.C. § 3732(a), 31 U.S.C. § 3732(b), and 28 U.S.C. § 1331.

3.     This court has personal jurisdiction over Defendants and is a proper venue

36

pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1931(b) in that Defendants do or transact business in this jurisdiction and the violations of the False Claims Acts described herein were carried out in this district.

## THE PARTIES

4.      Comfort Community Center, LLC, which does business as "Comfort Community Center" and "Comfort Community Living Services (a division of Comfort Community Center, LLC)" (collectively "CCC"), is a for-profit provider of services to adults with varying diagnoses, offering a Day "Training" program for adults with behavioral and developmental disabilities, mental health diagnoses, and traumatic brain injuries.

5.      CCC's principal place of business is 700 Sandy Plains Rd, Suite B14, Marietta, GA 30066.

6.      Emmanuel Wohiren, Executive Director of Comfort Community Center, purports to have a background in information systems, but confided in Relator Engram that he decided to switch careers into working with adults with disabilities because the "money was good" and a person could "make money without putting a lot into it."

7.      Before opening CCC in 2009, Wohiren had no prior experience in education, behavioral management, social work, or any other related field.

2

8.     Despite this lack of knowledge and experience, Wohiren maintains a stranglehold on day-to-day operations in order to ensure maximum profit.

9.     He is assisted by Hauser, who has been employed with CCC as Wohiren's assistant since its opening.

10.    Like Wohiren, Hauser does not have any relevant prior experience.

11.    By contrast, Relator Shay Engram has a Masters in Psychology with a Behavior Science emphasis, and is a nationally certified Non-Violent Crisis Intervention Trainer, a registered Behavior Technician, and a Qualified Developmental Disability Professional. For more than twenty-five years, Ms. Engram has devoted her professional life to helping others in situations ranging from abuse and neglect to physical and developmental disabilities, as well as trying to improve the lives of those with mental health and behavior disorders.

12.    As the former Program Director, Behavioral Specialist, and Developmental Disability Professional (DDP) of CCC, Ms. Engram has firsthand knowledge and is an original source of all of the schemes described herein, and had access to CCC's client files and limited access to billing.

## FEDERALLY FUNDED HEALTH PROGRAMS

13.    A developmental disability ("DD") is defined by the Georgia Department of Behavioral Health and Developmental Disabilities ("DBHDD") as a cognitive

3

or physical impairment (or a combination of both) that continues indefinitely, manifests before the age of 22, and results in limitation in at least three of the following life areas: self-care, receptive/expressive language, learning, mobility, self-direction, capacity for independent living, or economic self-sufficiency.

14.     Nationally, one out of every six families is affected by some type of DD, such as autism, cerebral palsy, Down's syndrome, epilepsy, or a neurological impairment.

15.     There are approximately 98,000 people in Georgia living with a DD.

16.     The financial impact on families with a member living with a DD is staggering: it costs two to three times more to care for a loved one with a disability compared to someone without a disability.

17.     Compounding the problem, in Georgia, 53% of families with disabilities have annual family incomes under $30,000, and 29% have annual family incomes under $15,000. About 28% of children with disabilities live in poverty.

18.     Once they age out of the educational system—and sometimes before— most persons with a DD need further support and assistance.

19.     A Medicaid Waiver provides financial support for services designed to enhance the quality of life of individuals with DDs and to assist their families.

20.     One-third of the cost of a Medicaid Waiver is funded at the state level and

two-thirds at the federal level.

21.     Two specific Medicaid Waiver programs are the New Options Waiver (NOW) and the Comprehensive Supports (COMP) waivers.

22.     NOW provides support to people who do not need 24-hour care, such as those with disabilities who live with family members or in their own home.

23.     There is a limit of $25,000 a year for services under the NOW Waiver.

24.     COMP waivers are designed for people who need a full range of out-of-home services or intensive in-home services.

25.     The COMP waiver is also used for people who are transitioning out of institutions into community living; COMP waivers pay for services greater than $25,000 a year.

26.     Both children and adults can be served by Medicaid Waivers.

27.     As the Georgia DBHDD website explains, "All services are designed to encourage and build on existing social networks and natural sources of support, and to promote inclusion in the community and safety in the home environment. Contracted providers are required to have the capacity to support individuals with complex behavioral and or medical needs."

28.     Similarly, the DBHDD contracts with providers such as CCC as a key part of their "statewide service delivery system for the treatment of mental illness and

emotional disturbance in adults and youth with a focus on recovery through community-based care, providing appropriate levels of service in the least restrictive setting possible."

29.     CCC accepts both NOW and COMP waivers for payment. CCC also accepts Medicaid funding for Community Access and Supported Employment services.

## FACTUAL BACKGROUND

30.     Prior to her employment with CCC, Ms. Engram was introduced to CCC as a consultant with Delmarva Foundations, where she was engaged to perform the role of Quality Improvement Consultant.

31.     Delmarva provides quality assurance of Service Providers for the state of Georgia. More specifically, DBHDD contracts with Delmarva to review Service Providers such as CCC, provide plans for improvement, and offer follow up with technical assistance.

32.     Delmarva performs this task through, *inter alia*, Quality Enhancement Provider Reviews ("QEPR"), Person Centered Reviews, Follow Up with Technical Assistance, and training sessions, all of which are at no cost to the provider.

33.     Ms. Engram worked with the Delmarva Foundation as a Quality

Improvement Consultant, supporting individuals with developmental and physical disabilities, traumatic brain injuries, and mental health diagnoses who received services through Medicaid waivers.

34.     While at Delmarva, Ms. Engram was part of a team that provided quality assurance consultative services for CCC, beginning in or about January 2012.

35.     This review lasted for several months and culminated in a week-long QEPR. Specifically, the team spent approximately three months conducting 1-on-1 Person Centered Reviews, followed by a week-long QEPR.

36.     At the end of the fourth day of the QEPR, the Delmarva review team met offsite and discussed the findings of its review of CCC.

37.     Certain concerns were universally raised by the team members:

     a. CCC had no Critical Incident Reports ("CIR") for the entire year. This was a red flag because it is implausible that CCC would have gone an entire year without a single incident. DBHDD policy dictates completing and maintaining CIRs.

     b. There was an unusually high number of medication errors. Among other things, current and previous months' Medication Administration Records were completed incorrectly or were missing. CCC also failed to follow virtually all policies and

procedures associated with medication management (such as having

side effects listed in the client file, what the medication is used for,

etc.) There was no evidence that the Direct Support Technicians

("DST") had been trained as to medication regimens or potential

side effects for the clients.

c. CCC lacked written policies and procedures for most DBHDD

standards of operation. The few written policies that existed did not

reflect current standards.

d. As shared by Wohiren, CCC had experienced a sizable "Medicaid

Payback" in 2011 for lack of supporting documentation.

38.    Approximately six weeks after that off-site meeting, CCC received a

complete QEPR report that strongly urged CCC to sign up for a Follow Up with

Technical Assistance ("FUTAC"), which would provide no-cost training and

assistance with the items that were not in compliance and/or which

demonstrated extreme deficits.

39.    In fall 2012, Emmanuel Wohiren began contacting Ms. Engram personally

to request help, including questions about staffing issues and documentation. On

one occasion, Ms. Engram even accompanied him to an intake for a potential

client. During this time, Ms. Engram provided her services *pro bono*, her only

intent being to get CCC on the right track to providing assistance to its clients.

40.     In October 2012, after additional meetings at the CCC office and at his home in Marietta, Wohiren presented Ms. Engram with a proposal to "help him" by assuming the positions at CCC of Program Director, Behavioral Specialist, and DDP.

41.     Ms. Engram began work formally at CCC on January 7, 2013.

42.     Throughout all of their discussions leading up to the offer and in the months before she started, Ms. Engram emphasized to Wohiren that the Delmarva QEPR had found many practices out of compliance, and it was her intention to "right the ship" in accordance with state standards.

43.     It was her belief at the time that Wohiren simply did not understand how to operate according to standards, and that she could train him and his staff so that CCC could be a model provider.

44.     During the period between her hiring and her start date, Ms. Engram was frequently in contact with Wohiren via e-mail and phone. Ms. Engram devised plans to address immediately the more extreme deficiencies at the day program.

45.     Wohiren shared with Ms. Engram during this time, and during her first two weeks at CCC, that there were several employees who he wanted to fire for not having completed daily charting of progress notes, behaviors, and goal

tracking for over five months.

46.     Once she began work at CCC in January 2013, to her dismay, Ms. Engram quickly discovered—and regularly reported to Wohiren—that CCC's problems were far worse than the Delmarva team had realized, and included multiple violations of critical state standards that endangered clients.

47.     In addition to these issues, Ms. Engram's role as DDP put her in position to see just how bad the "care" being provided at CCC was.

48.     But as she eventually discovered, Wohiren did not want her expertise in order to comply with regulations; rather, he was only interested in avoiding detection of CCC's shortcomings and ensuring that there would be no more instances of "that old lady from the state causing me paybacks," as had occurred with 2011 Medicaid funding.

49.     In fact, even before Ms. Engram's arrival, Wohiren had instructed Kim Hauser to start re-writing progress notes.

50.     The practice escalated as the date for a planned application for CARF accreditation drew closer, with Wohiren ordering a massive documentation fraud project, dividing staff into "teams" to conduct the re-writes, with management personnel assigned to monitor and assist each team.

51.     Ms. Engram tried to stop this practice, first by showing Wohiren the

10

pertinent standards and urging him to abandon his plan.

52.     Wohiren's response was that he was just "writing Medicaid a check" and telling them that CCC was already in the process of correcting documentation issues.

53.     Ms. Engram waged war on the fraud and care issues at CCC for six months, but by June 2013, Wohiren had had enough of her interference and countermanding of his orders.

54.     Wohiren conspired with certain staff members to have Ms. Engram arrested for supposed abuse of a client. Although the charges were not substantiated, it destroyed her credibility.

55.     Wohiren terminated Ms. Engram's employment via letter received July 1, 2013.

## FRAUDULENT SCHEMES

### Understaffing Exceptional Rate Clients

56.     At day training programs like CCC, DSTs are assigned to work directly with the clients in classrooms, in the community, or one-on-one, based on their needs. The DSTs are to follow an Individual Support Plan ("ISP") that has been approved by DBHDD, and are to complete progress notes and goal-tracking logs for each day that the client is present in the Day Program. These documents

should be in each client's file, documenting what the client did each day, how they responded to training, any progress they made, etc.

57.    Each DST is to be assigned a caseload with a maximum of 10 clients. However, "Exceptional Rate" ("ER") clients require 1:1 or 2:1 services, and so should have dedicated DST(s) who spend each and every day with them.

58.    CCC was paid 2.2 to 2.9 times the established standard rate for ER clients, or the entirety of their COMP individual budgets, depending on their needs.

59.    The payment of these exceptional rates is derived from "the enhanced service delivery specific to the exceptional needs of the participant," including one or more of extraordinary staffing requirements, specialized staff, and enhanced professional oversight.

60.    The DSTs are supposed to be trained on their individual clients' ISPs, which are customized. The DST is supposed to meet with the client, plan how to achieve the goals listed on the ISP, and then assist the client each day to work toward meeting those goals.

61.    CCC routinely understaffs its ER clients, generally putting them into groups instead of providing the 1:1 or 2:1 supervision that Medicaid has paid for.

62.    The CCC website specifically advertises that it offers 1:1 ratios for qualifying patients.

12

63.     When Ms. Engram started in January 2013, every DST had a caseload of 7-10 clients, which included those clients designated to be 1:1 or 2:1.

64.     She immediately brought this to Wohiren's attention, to no avail. As she continued to press him to hire new staff, she also tried a number of interim solutions (such as rearranging the case load groups to attempt to minimize the number of 2:1 and 1:1 patients in each group, and sitting in on some groups herself) but it was clear that the only real solution was to hire more staff.

65.     Finally, in a management meeting, Wohiren lost patience and shouted that "Nobody follows this! If you think you can do it, do it!"

66.     One example of an ER client in a group setting is client LA, listed as requiring a 1:1 ratio on Ms. Engram's group placement notes, who instead spent his days in a group setting. In fact, LA was in a group ratio of about 1:10, until Ms. Engram was able to get him into a smaller (but still not 1:1) group.

67.     From March 2013 through September 2013, CCC submitted 34 claims to Georgia Medicaid for $20,553.18 under procedure code T2025 for exceptional rate services it falsely claimed to have provided to client LA, and Georgia Medicaid paid $19,480.32 to CCC for these claims.

68.     Another example of an ER client fraud was that of client RM, a diabetic who received an ER order to pay for a nurse to administer his insulin injections,

13

but on many occasions, CCC instead had Hauser – who is not a nurse – perform the injections.

69.     From December 2012 through November 2013, CCC submitted sixty claims to Georgia Medicaid for $32,175.36 under procedure code T2025 for exceptional rate services it falsely claimed to have provided to client RM, and Georgia Medicaid paid $31,882.52 to CCC for these claims.

70.     From February 2014 through January 2015, CCC submitted 63 claims to Georgia Medicaid for $22,078.08 under procedure code T2025 for exceptional rate services it falsely claimed to have provided to client RM, and Georgia Medicaid paid $21,930.72 to CCC for these claims.

71.     From February 2015 through October 2015, CCC submitted 45 claims to Georgia Medicaid for $13,094.40 under procedure code T2025 for exceptional rate services it falsely claimed to have provided to client RM, and Georgia Medicaid paid $12,945.60 to CCC for these claims.

72.     As another example, client SW was supposed to receive exceptional rate services but was placed in a group setting.

73.     From March 2013 through May 2013, CCC submitted 12 claims to Georgia Medicaid for $6,420.28 under procedure code T2025 for exceptional rate services it falsely claimed to have provided to client SW, and Georgia Medicaid paid

$6,420.28 to CCC for these claims.

74.     To mask the ER Client fraud, Wohiren brought had other staff, who were

assigned to duties such as working in the Day Program, the residential settings,

and/or transportation—all without the mandated trainings—and assigned them

also to be "readers" (who altered client files).

75.     When DBHDD or other monitoring personnel arrived unannounced,

Wohiren would direct staff members – including Ms. Engram and managers who

normally had no daily direct contact with clients – to immediately join sessions

so as to give the appearance of a 1:1 or 2:1 monitoring and to stay until the visitor

left.

76.     On four separate occasions, Relator witnessed an ER Client, who was

required to have 1:1 monitoring, left unsupervised. This client had a history of

molesting other clients, and he did so again when left unsupervised.

77.     Upon information and belief, CCC never achieved the level of staffing for

which it is still being paid.

### Engram's Attempts to Stop Additional Fraud Lead to Retaliation

78.     Relator witnessed and either complained about or tried to correct a

number of other schemes perpetrated by CCC that violated the federal and state

False Claims Acts, which ultimately led to CCC and Wohiren retaliating against

her.

*Missing/Falsified Documentation for Services Never Provided*

79.     For example, in her various roles at CCC, Ms. Engram reviewed hundreds of Behavior Support Plans, ABC tracking logs, goal tracking forms, and progress notes that were missing key supporting information, such as clients' goals, whether the goals were addressed or the recommended plans were implemented, dates, signatures of staff, and basic legibility.

80.     Engram endeavored to train DSTs to write proper notes and was able to train four people before Wohiren lost patience with the amount of time being devoted to training and shut down her training program.

81.     Instead, Wohiren instructed DSTs to write simple and generic notes that would enable easy rewrites; ultimately, he devised a "cheat sheet" for progress notes.

82.     In addition to missing notes, Ms. Engram also reviewed progress notes that she knew to be false, because they indicated services that she knew were not provided.

83.     For example, when a DST was absent, those staff members present were told to write progress notes for the absentees as if they had been present and had provided services to the clients. In fact, this policy was one of the major

complaints of the DSTs themselves, and was mentioned by a DST in the very first survey that Ms. Engram conducted in her first two weeks at CCC.

84.     Ms. Engram also personally observed specific incidents of fraud that occurred when Support Coordinators were on-site for reviews, whether announced or unannounced.

85.     In instances in which CCC received advanced notice of an upcoming onsite review for a given client, Wohiren would direct staff and the clients' DSTs to "fix the books" and would himself delay the Support Coordinator to give the facility time to do so.

86.     If any progress notes were missing, as was usually the case, those were created whole cloth.

*Re-Write Teams*

87.     In the wake of having to repay Medicaid for 2011 funds due to CCC's lack of documentation, Wohiren sought to use Ms. Engram's expertise to cover up CCC's errors rather than correct its practices.

88.     Two new hires were categorized as "readers" and (along with existing staff) were assigned to review and alter existing files.

89.     Wohiren created teams of five to seven DSTs with an overseeing manager to rewrite (or if necessary, create from scratch) progress notes and data tracking

to match billing that had already been submitted to Medicaid. These teams were ordered to work together to "fix" the files.

90.   Ms. Engram and other staff members objected to this practice, but Wohiren threatened the staff with termination if they refused to follow his orders.

91.   In the meantime, Ms. Engram completed her own assigned rewrites slowly, and deliberately included "red flag" phrases such as "as shared by" and "as reported by" and the like. When staff questioned whether they were going to "get in trouble with the state" for following orders, she suggested they use similar notifications.

92.   Ms. Engram also encouraged staff to report to proper entities any practices that they felt were inappropriate.

*Unqualified Staff/Refusal to Train*

93.   Ms. Engram reviewed employee files and discovered that virtually all were incomplete and lacked data and documentation required by Medicaid standards.

94.   Personnel files lacked HIPAA documentation, background checks, copies of drivers' licenses, insurance cards, and DMV reports.

95.   When she started to correct what she first thought was merely a documentation problem, Ms. Engram discovered that one of the employees was

a convicted felon; that the transportation manager who drove and maintained the company vehicles did not have a current driver's license; and that staff members who worked directly with clients had not had employee orientations for basic procedures.

96.     Each time Ms. Engram came to Wohiren with these findings, he demanded that everything she found had to go through him first, and he alone would decide how to proceed.

97.     Relator also learned that CCC's transportation manager was selling both prescription and street drugs, as well as "boot-leg" DVD's, from the back of the company van, which he was allowed to take home at night.

98.     Ms. Engram reported these issues to Wohiren three or four different times, but he did nothing to stop the practices.

99.     Wohiren also interfered with Ms. Engram's attempts to train the staff, saying that training took up too much of their time.

100.    Wohiren instead implemented a "drive-by training" plan, in which training classes were reduced to 3-5 minutes, and included a "test" that was either open book or simply had the answers attached.

101.    CCC also falsified the amount of time the employees spent in training.

*Internal Reporting and Reporting to the State*

102.    Ms. Engram contacted DBHDD Region 1, first anonymously and at least three times using her own name, to report severe discrepancies and safety issues, including but not limited to: (1) the aforementioned documentation fraud; (2) outdated individual service plans; (3) lack of qualified staff and improper and falsified training implemented by Wohiren; and (4) refusals to file Critical Incident Reports with the state.

103.    Ms. Engram also reported the documentation fraud to a DBHDD Investigator.

104.    The continued calls to DBHDD resulted in at least two visits by a DHBDD Investigator.

105.    Wohiren barred Ms. Engram from entering the room with the DBHDD Investigator.

106.    By early 2013, several staff members had complained to Ms. Engram about physical and verbal abuse by Wohiren. They stated that Wohiren had threatened them, saying that he would fire anyone who went against him and that he had a lot of money for lawyers.

107.    Ms. Engram recorded their concerns in their own words into letter format, which she mailed to DBHDD on or around April 4, 2013.

108.    In addition to the many efforts at reporting detailed herein already,

beginning approximately April 2013, Ms. Engram reached out to the following

persons: Stephanie McGruder, DBHDD – Constituent Services; Healthcare

Facilities Regulations; DBHDD Region 1 Commissioner's Office; Adult Protective

Services; Aging Services (as directed by APS); and Constituent Services.

### Deliberate Set Up of Relator Engram

109.    In February 2013, even though Ms. Engram kept her office locked when

she was away, she began to find documents that had been on her desk or in her

locked filing cabinet had been moved to the CCC shred box.

110.    A CCC employee brought this to her attention when she saw piles of

documents that Ms. Engram stated were missing, including some that she had

assisted Ms. Engram in preparing, some that she had completed herself, and

documents that had been taken from client files.

111.    In March 2013, Wohiren began reassigning some of Ms. Engram's job

duties to Kim Hauser (including duties for which Hauser was not qualified).

112.    Hauser, unlike Ms. Engram, did not question Wohiren and was not

hesitant to instruct staff to act unethically.

113.    DSTs consulted with Ms. Engram when they knew Hauser's directions

were improper.

114.    Staff members began to regularly report to Ms. Engram that Wohiren told them that they did not have to follow any of Ms. Engram's policies or directives and that he was going to get rid of her.

115.    On June 5, 2013, Wohiren suggested to Ms. Engram that she should she "put the company first" by not reporting violations such as the physical abuse of clients to the state. He told her that she should act more like "other people" and follow his instructions.

116.    Ms. Engram told him that she had understood that she was brought in to do the job "the right way."

117.    Wohiren yelled at Ms. Engram, making such remarks as "I'm gonna ruin your name!" and "You think you should put yourself before CCC?!" and "I'm gonna take you down!"

118.    On June 19, 2013, Kim Hauser and CCC employee Rasheika Best orchestrated an incident with one of the clients, CP. CP has a long history of violence, erratic behavior, and of making false reports. At the request of Hauser and Best, Ms. Engram assisted them with calming CP, who had gone into the side yard of CCC and was behaving erratically.

119.    Marietta police came to the scene and when they left, stated their intent to investigate the incident further.

120.    Ms. Engram left for the day very upset. CP, who had wet herself during

the incident, was supposedly taken home for a change of clothes. In fact, she was

driven to the hospital by Ms. Best, where Best reported to the authorities that Ms.

Engram had assaulted CP.

121.    When Ms. Engram returned to work the following day, Wohiren

suspended her and refused to allow her to complete a CIR of the incident. Even

though he had not been present during the incident, he insisted on writing the

CIR himself and refused to allow Ms. Engram to see it.

122.    On June 26, 2013, DST Dwayne White informed Ms. Engram that Wohiren

was boasting that he was going to have her arrested.

123.    Ms. Engram reached out to Wohiren and asked when he expected the state

investigators to interview her, and was told that they had "just left [CP's] house"

and were on their way to her house, and urged her to wait there.

124.    Relator knew that it was not the practice of state investigators to come to

the home of an alleged abuser for interviews. Sure enough, shortly thereafter, the

police came to Ms. Engram's home and she was arrested in front of her daughter

and neighbors and charged with misdemeanor battery.

125.    Ms. Engram was formally fired on July 1, 2013.

126.    Ultimately, the prosecutor filed a notice of *nolle prosequi*, and no further

action was taken.

127.    The resulting damages to Ms. Engram's reputation and standing in her chosen field cannot be overstated. Ms. Engram was unable to find work for a substantial period and ultimately was forced to relocate out of state for a number of years.

128.    Upon information and belief, Wohiren has continued to harass Ms. Engram and/or cause others to do so, up to and including during 2018, by vandalizing her property and by having people bang on doors and windows of her home at night.

## COUNT I
### Violation of 31 U.S.C. § 3729 – Federal False Claims Act

129.    Relator incorporates and realleges herein all other paragraphs as if fully set forth herein.

130.    As set forth above, Defendants CCC and Wohiren, individually and by and through their agents, officers, and employees, knowingly presented or caused to be presented numerous false or fraudulent claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

131.    As set forth above, Defendants CCC and Wohiren, individually and by and through their agents, officers, and employees, knowingly made, used, or

caused to be made or used, false records or statements material to numerous

false claims, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

132.    Due to Defendants' conduct, the United States Government has suffered

substantial monetary damages and is entitled to recover treble damages and a

civil penalty for each false claim, statement, or record. 31 U.S.C. § 3729.

133.    Relator is entitled to reasonable attorneys' fees and costs, pursuant to 31

U.S.C. § 3730(d)(1).

**COUNT II**
**Violation of Ga. Code Ann. § 49-4-168.1 – State False Medicaid Claims Act**

134.    Relator incorporates and realleges herein all other paragraphs as if fully set

forth herein.

135.    As set forth above, Defendants CCC and Wohiren, individually and by

and through their agents, officers, and employees, knowingly presented, or

caused to be presented to the Georgia Medicaid program numerous false or

fraudulent claims for payment or approval, in violation of O.C.G.A. § 49-4-

168.1(a)(1).

136.    As set forth above, Defendants CCC and Wohiren, individually and by

and through their agents, officers, and employees, knowingly made, used, or

caused to be made or used, false records or statements material to numerous

false claims, in violation of O.C.G.A. § 49-4-168.1(a)(2).

137.    Due to Defendants' conduct, the State of Georgia has suffered substantial monetary damages and is entitled to treble and a civil penalty for every false claim, statement, or record. Ga. Code Ann. § 49-4-168.1.

138.    Relator is entitled to reasonable attorney's fees, costs, and expenses. Ga. Code Ann. § 49-4-168.2(i).

**COUNT III**
**Violation of 31 U.S.C. § 3730 – Retaliation**

139.    Relator incorporates and realleges herein all other paragraphs as if fully set forth herein.

140.    CCC and Wohiren violated Relator Engram's rights pursuant to 31 U.S.C. § 3730(h) by retaliating against her for lawful acts done by her in furtherance an action under the False Claims Act and other efforts to stop one or more violations alleged in this action.

141.    As a result of Defendants' actions, Relator Engram has suffered damages in an amount to be shown at trial.

**COUNT IV**
**Violation of Ga. Code Ann. § 49-4-168.4 – Retaliation**

142.    Relator incorporates and realleges herein all other paragraphs as if fully set forth herein.

143.    CCC and Wohiren violated Relator Engram's rights pursuant to Ga. Code Ann. § 49-4-168.4 by retaliating against Relator Engram for lawful acts done by Relator Engram in furtherance of an action under this section, including investigating matters that could reasonably lead to the filing of such an action.

144.    As a result of Defendants' actions, Relator Engram has suffered damages in an amount to be shown at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Relator prays for judgment:

(a) awarding the United States treble damages sustained by it for each of the false claims;

(b) awarding the United States a maximum civil penalty for each of the false claims, statements, and records;

(c) awarding the State of Georgia treble damages sustained by it for each of the false claims;

(d) awarding the State of Georgia a maximum civil penalty for each of the false claims, statements, and records;

(e) awarding Relator 30% of the proceeds of this action and any alternate remedy or the settlement of any such claim;

(f) awarding Relator special damages resulting from the retaliation

27

pursuant to 31 U.S.C. § 3730(h) and O.C.G.A. § 49-4-168.4;

(g) awarding Relator damages resulting from her malicious prosecution, pursuant to O.C.G.A. § 51-7-47;

(h) awarding Relator her litigation costs and reasonable attorney's fees; and

(i) granting such other relief as the Court may deem just and proper.

Respectfully submitted,

Julie K. Bracker
Georgia Bar No. 073803
Jason Marcus
Georgia Bar No. 949698
**BRACKER & MARCUS LLC**
3225 Shallowford Road
Suite 1120
Marietta, GA 30062
Tel. (770) 988-5035
Fax (678) 648-5544
Julie@FCAcounsel.com
Jason@FCAcounsel.com